[Crim. No. 747. Fourth Dist. Mar. 26, 1951.]

THE PEOPLE, Respondent, v. ANTHONY AVILLA, Appellant.

Johnson & Johnson for Appellant.

Edmund G. Brown, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with the murder of his wife and was found guilty of second degree murder. He appeals from the judgment, and from an order denying his motion for a new trial.

The appellant and his wife had been married for 33 years. He was 65 years of age, and was afflicted with some sort of heart ailment. He had had two "strokes," one of which left him blind in one eye and partially paralyzed on his left side. He had been unable to work for three or four years but was able to walk about the house and yard, and go to the grocery store. He did most of the housework while his wife worked elsewhere and supported the family. There is evidence that during this period the wife was attentive to his wants and solicitous of his welfare.

The couple lived in a small house in La Jolla. On May 10, 1950, a man and his wife who lived next door, their house being but five feet away, came over and visited from 6 to 8 p. m. They had two "short drinks" of whiskey each, except that the appellant drank two glasses of diluted wine. These neighbors went home about 8 p. m. and after she had prepared dinner the neighbor's wife heard a shot, and about 10 minutes later another shot. Thinking he had shot at a dog, she paid no attention to it. Shortly thereafter, she heard a "pounding on the floor" which was a signal they had agreed upon in the event the appellant had one of his heart attacks and needed help. She went over and found the appellant lying on a couch in the living room. He had a bad wound in the shoulder, there was a large amount of blood on his clothing and the couch, and a rifle was lying there. When she entered the appellant said "I shot and killed Jessie." She asked him if he realized what he had said, and he repeated the statement. She asked him where the deceased was and he answered "She is somewhere in the house." She went to the kitchen and found the appellant's wife slumped over the table, dead. Apparently, she had been sitting there curling her hair and applying cosmetics. Police officers arrived about 9:30 and the appellant told them he had shot and killed his wife and not to blame anybody but him.

The appellant was taken to a hospital and his own doctor

called. He told this doctor "Jessie kept at me and kept at me and that is why this came about." In the presence of the doctor the appellant told an officer that his wife was always nagging at him and that he told her she would be sorry some day if she didn't stop. He also told the officer that his wife had become intoxicated during the evening and had cursed him; that he went to the closet, obtained the gun, loaded it with two shells and fired at his wife; that he then placed the muzzle of the gun under his left armpit with the intention of committing suicide; and that he was disappointed that he missed the vital spot.

At 2:10 p. m. the next day, the appellant made a statement in the presence of several officers which was taken down by a reporter, and which covers 15 pages of the transcript. This statement was made voluntarily, and it appears therefrom that the appellant answered a great number of questions intelligently, some of them at considerable length. He stated that his wife had been drinking the night before; that "she started in on me again" and he asked her to leave him alone; that he wasn't paying much attention to what she was complaining about; that she just started in "cussing" and calling him lazy and good for nothing; that he told her "I can't go on living this way. We might just as well end it up"; that he went into the living room, and got the gun which was kept in a closet; that he got a box of shells from a cupboard; that before he got the gun he said "I'll finish up the work now. I can't stand your nagging at me"; that he got the shells and said "One for me and one for you"; that he put two shells in the gun; that his wife was sitting there and no one else was present; that his wife kept on "cussing" him and he shot her; that he then "took the other one—I wanted it for my heart but I missed"; that he and his wife always got along except when she was drinking; that arguments between them had gone on for a long time whenever she would drink; and that "I simply just grabbed two shells and put them in there, one for me and one for her. I just thought that."

The appellant testified on the stand that after the neighbors left that night his wife upset him by her talk; that this had gone on for eight months and he felt he could not stand it; that his wife was nagging and fussing at him because he couldn't work; that he thought he could not "go on" any more after he threw one or two shells into the gun; that everything then went hazy; that he could remember nothing about what he had said to the neighbors or the officers, or

about his statement given to the officers the next day; and that he remembered nothing until three or four days later. On cross-examination he was asked as to just what he thought at the time or about the time of the shooting. He replied "Well, I thought—well, the thing is if I am going to be like this all the time what am I doing here? I am just a burden here and I just says—I might just as well pass on. If I was going to have any hell, I thought to myself, I might just as well go some place else and have it as to stay here and have it." He was then asked whether he had told this to his wife at that time. He replied "No, I didn't say nothing to her, any more than when I made up my mind, I said, 'Well it is the time now to end it up.' "; that "I never said anything to her after that"; that she was sitting there and he recalled getting up and going over to get the gun; and that he knew nothing else until he was in the hospital.

It is first contended that the evidence is insufficient to establish murder in the second degree, and that there is nothing in the evidence which would support any conclusion other than that the shot was fired in such a sudden passion as would necessarily reduce the crime to manslaughter. The statements and admissions of the appellant, as well as portions of his testimony, support the conclusion that the situation of which he complained had been building up for some eight months, that he came to feel that he did not want to go on with it indefinitely, and that he finally decided to take drastic means to end it. The evidence as a whole indicates this rather than that he acted unthinkingly, in the heat of passion, and as a result of a sudden quarrel. Assuming that part of the evidence might have supported a conclusion that he fired this shot in the heat of passion, the evidence is sufficient to support a contrary conclusion. Nothing more than a conflict appears, and the view taken by the jury is amply supported by the record.

The only other point raised is that the court committed prejudicial error in refusing to give an instruction relating to the commission of a crime under the heat of passion. This requested instruction stated that this heat of passion must be such as would be aroused in the mind of any reasonable person in the given facts and circumstances, and that "the conduct of the defendant is to be measured by that of the ordinarily reasonable man placed in identical circumstances." It is argued that because the appellant was an invalid he should not be judged by what is expected of

an ordinarily reasonable person in good health, and that the jury should have been told, as was done by the quoted part of the requested instruction, that the appellant's conduct was to be measured by that of an ordinarily reasonable man placed in "identical circumstances." The court gave a longer and more complete instruction on this subject. In referring to how the conduct of an accused was to be measured, it used the words "in the same or similar circumstances as those in question," and later on the words "if placed in the same position in which the defendant found himself," instead of using the words "identical circumstances." The matter was clearly and completely covered in the instruction given and neither error nor possible prejudice appears.

The judgment and order are affirmed.

Griffin, J., and Mussell, J., concurred.